# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
# 5:16-cv-196-FDW

| | |
|---|---|
| TION L. BRADLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| SUSAN WHITE, ET AL., ) | |
| ) | |
| Defendants. ) | |

**THIS MATTER** is before the Court on initial review of Plaintiff's Complaint, (Doc. No. 1). Plaintiff is proceeding *in forma pauperis*. (Doc. No. 5).

## I. BACKGROUND

*Pro se* Plaintiff Tion Bradley has filed a civil rights suit pursuant to 42 U.S.C. § 1983 against the following Defendants in their official and individual capacities: Alexander Correctional Institution Superintendent Susan White, Alexander C.I. Assistant Superintendent Eric Dye, and Alexander C.I. Unit Manger April Parker.

Construing the Complaint liberally and accepting its allegations as true, Plaintiff appears to allege that he fell in the shower and suffered a sprained back on May 3, 2015, due to the Defendants' negligent failure to provide a working light and mat. While Plaintiff was unconscious, Sergeant Clifton and staff carried him back to his cell and left him there while unresponsive and handcuffed. A little while later, Clifton and Lieutenant Triplett came to get the handcuffs. (Doc. No. 1 at 7). Upon standing up, Plaintiff became extremely dizzy and chose to lie back down. Plaintiff informed Clifton and Triplett of his "medical conditions" and instead of getting help, they put together and extraction team which put him in full restraints, removed legal mail from his cell

1

and tore it up, and failed to provide a bathroom break every eight hours as dictated by policy.

Plaintiff filed a tort claim about falling in the shower and "it seems like prison officials been out to get [him] ever since." (Doc. No. 1 at 9).

The next day, May 4, 2015, Plaintiff informed Officer Gum that he had used the bathroom on himself and asked that Parker be notified. Parker came to Plaintiff's cell door and Plaintiff notified her of his "conditions" (Doc. No. 1 at 7). Parker said that Plaintiff "play[s] to[o] much" and walked away, leaving Plaintiff in his urine and feces. (Doc. No. 1 at 7). Officer Gum came into Plaintiff's room three times to feed him that day because of Plaintiff's dizziness. Plaintiff spent the whole day lying in the same spot where Clifton and Triplett left him. Nurse Bise and Officer Gum put a mat back in his cell that Sergeant Clifton had removed and given to a White inmate.

On May 5, Parker came to see a White inmate with feces all over the walls and allowed him to shower. Parker only got Plaintiff help after other African-American inmates became upset, kicking and banging on doors, because Plaintiff had not been given any help. A doctor was summoned, said Plaintiff had a sprained back, and set an appointment for an x-ray which "staff" refused to let him attend. (Doc. No. 1 at 8).

On the morning of June 21, 2015, Officers Snyder and Rodriguez, and Sergeant Collier conducted a cell search. They took all Plaintiff's legal mail dealing with the tort claim about the shower. (Doc. No. 1 at 9).

Plaintiff is allergic to carrots and pineapple so he was placed on a special diet containing no processed meat, carrots, or pineapple. When Plaintiff refused to eat processed meat that he was erroneously given, staff refused to correct the error and he was placed on Nutraloaf on Jun 29, 2015. (Doc. No. 1 at 14). Plaintiff told "prison officials" he was not eating until they gave him real

food but that never happened so Plaintiff went on a hunger strike. (Doc. No. 1 at 9).

On July 2, 2015, Plaintiff passed out in the recreation cage due to low blood sugar. Instead of taking him to medical for observation, they carried him back to his cell and later checked his blood sugar which was 35, and took his personal property. Sergeant Johnson, Parker and "everyone on that shift" stood around while the property was removed from his cell. (Doc. No. 1 at 14). "Staff" lost property including his family pictures and prayer rug. (Doc. No. 1 at 14). Plaintiff's property was returned on July 6, 2015, from Officers Setter and Coldwell, who informed him that no DC-160 property receipt form was completed and that records indicated that Plaintiff had already received his property.

The next day, July 3, 2015, Plaintiff was in restricted housing run by Parker when he passed out in his cell due to low blood sugar. When Plaintiff went to the door to have his handcuffs removed, Officers Collier, Daves and Snyder, and other officers stood around his door, blocking the camera's view, while Daves and Snyder twisted his wrist and slammed his arm repeatedly in the food trap. (Doc. No. 1 at 11). Plaintiff was yelling "my hand is in a fist and I'm not touching anyone. My hand is in a fist." (Doc. No. 1 at 11). Collier, the shift supervisor, stood and watched as his officers used excessive force through the cell door, then Collier struck Plaintiff multiple times on his left arm. (Doc. No. 1 at 12). The OIC was notified and came to take pictures the same day, right before Plaintiff was placed in full-restraints. Medical did not check on him for injuries. (Doc. No. 1 at 12). The OIC, Captain Hamilton, came to take his statement for the incident report. Plaintiff was not written up until 20 days later after he wrote a grievance and had his mother call the institution. Plaintiff was then written up for assaulting an officer,which was done to justify their wrongdoings. (Doc. No. 1 at 12). Plaintiff feels these actions were strictly out of retaliation for filing the tort claim.

3

On August 4, 2014, Officers Ishbell and Baker came to get Plaintiff for the disciplinary hearing. Collier tried to start a conversation but Plaintiff asked him not to speak to him. While Plaintiff was at the hearing, Collier and/or Johnson searched Plaintiff's cell and ripped up his legal statement about being hit, flushed his "religious oils" down the toilet, and tore up one or two magazines, and personal books he is allowed to have. (Doc. No. 1 at 12). Plaintiff came back from the disciplinary hearing, saw that his belongings were scattered and ripped up, and asked for Officer Isbell to place him back in full restraints and get the OIC. Captain Maynor came to see Plaintiff, who explained about his destroyed belongings. Plaintiff was not written up for having contraband so there was no reason for prison officials to destroy his property. Maynor said he would fix the situation and instructed Plaintiff to write a grievance. Plaintiff did so but nothing happened. Collier's actions were retaliatory.

On August 27, 2015, Plaintiff found blood coming out of his backside during wash-up and declared a medical emergency. Nurse Schilling and prison officials Baker and Isabell laughed at Plaintiff's condition. Plaintiff asked them to leave and to speak to the OIC because he had a serious condition and their laugher was unprofessional. When the OIC showed up, Plaintiff submitted to handcuffs so prison officials could remove his personal property "because it was said that I used profane language when I only wanted medical attention for a serious matter." (Doc. No. 1 at 15). "Prison officials" including Johnson placed him in a shower and demanded that he remove his clothes. Plaintiff refused so they formed an extraction team to force him to undress. Plaintiff finally took off his clothes because he was afraid he would be beaten.

A Prison Rape Elimination Act ("PREA") investigation started on August 27, 2015. Plaintiff was interviewed. Johnson, who was not supposed to be involved in the investigation, falsely stated that other inmates refused to be interviewed in order to cover up prison officials'

4

wrongdoings and unprofessional actions. (Doc. No. 1 at 16).

On August 28, 2015, Plaintiff was written up for having a ball of plastic wrap and "holding the trap," which he did not do. (Doc. No. 1 at 16). Plaintiff asked prison officials to place him back in full restraints while he waited for the OIC. Prison officials left his trap open; "it was said they came to get my property due to profane language but prison officials realized that wasn't good of enough reason to force me to get naked." (Doc. No. 1 at 16).

On September 24, 2015, Officer White grabbed Plaintiff's backside during a pat-down. "Other prison officials" claimed that they did not see it happen, but every officer takes up for the other even when the officer is wrong. (Doc. No. 1 at 17). Officer White had done the same thing to another inmate in 2013. Something should have been done to prevent this from happening a second time. Plaintiff wrote to Superintendent White, Assistant Superintendent Dye, and Mr. Poteat but nothing has been done. He wrote a grievance on the situation but nothing happened and Officer White is still on the unit. White and Dye both have enough "say so" to have Officer White moved off the unit. (Doc. No. 1 at 17).

On November 13, 2015, Officer Cook called Plaintiff "nigger" in the hallway and spoke to him in a sarcastic manner. (Doc. No. 1 at 18). Sergeant Johnson said he did not care and refused to get the OIC until other inmates began to "act out." (Id.). Lieutenant Beaver came to the cell and told Plaintiff to write it up. Plaintiff did so but nothing happened. On November 22, 2015, Clawson called Plaintiff "bitch" and called him "nigger" twice for no reason. (Doc. No. 1 at 19). Plaintiff asked to see the OIC and wrote a grievance.

On March 7, 2016, Officer Johnson slammed Plaintiff's hand inside the trap as Plaintiff was reaching for his lunch tray. Moments later, Lieutenant Clifton, Unit Manager Poteat, and Officers Baker, Caldwell and Clawson came to put Plaintiff in restraints and remove his personal

5

property. When Plaintiff received his property back he discovered that a lot of it was destroyed or missing. Plaintiff returned his property to Officer Rorack and asked to speak to the unit manager. Clawson, who Plaintiff had written up for racial slurs, was on the DC-160 as well as the officer who inventoried the property, and had a motive to destroy/throw away Plaintiff's personal property. Clawson admitted to Plaintiff that he did these things. (Doc. No. 1 at 20).

Superintendent White is responsible for Plaintiff's well-being and for the negligent acts of all her employees. Everyone in the Complaint was acting under the supervision of White and Parker. White was "notified but did nothing to fix the situation." (Doc. No. 1 at 8). Parker also "knows of the situations" and neither White nor Parker have "done anything to fix the issues, instead they turn a blind eye to things that the prison staff do back here which resulted in one inmate dead and [Plaintiff] being hurt." (Id.). They know use of force is excessive and violates the Eighth Amendment when it is not applied in an effort to maintain or restore discipline, but rather, maliciously. (Doc. No. 1 at 9).

Plaintiff seeks $50,000 "to start a life in the music world where I don't have to use my back as much…." (Doc. No. 1 at 3).

**II. STANDARD OF REVIEW**

A "court shall dismiss [a prisoner's] case at any time if the court determines that ... the action or appeal ... fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii). A complaint should not be dismissed for failure to state a claim "unless 'after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief.'" Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir.

1999)). In its frivolity review, a court must determine whether the Complaint raises an indisputably meritless legal theory or is founded upon clearly baseless factual contentions, such as fantastic or delusional scenarios. Neitzke v. Williams, 490 U.S. 319, 327-28 (1989).

A *pro se* complaint must be construed liberally. Haines v. Kerner, 404 U.S. 519, 520 (1972); see also Smith v. Smith, 589 F.3d 736, 738 (4th Cir. 2009) ("Liberal construction of the pleadings is particularly appropriate where … there is a pro se complaint raising civil rights issues."). However, the liberal construction requirement will not permit a district court to ignore a clear failure to allege facts in his complaint which set forth a claim that is cognizable under federal law. Weller v. Dep't of Soc. Servs., 901 F.2d 387 (4th Cir. 1990). A *pro se* complaint must still contain sufficient facts "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007); see Ashcroft v. Iqbal, 556 U.S. 662 (2009) (the Twombly plausibility standard applies to all federal civil complaints including those filed under § 1983). This "plausibility standard requires a plaintiff to demonstrate more than a sheer possibility that a defendant has acted unlawfully." Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted). He must articulate facts that, when accepted as true, demonstrate he has stated a claim entitling him to relief. Id.

### III. DISCUSSION

**(1)** **Unnamed Defendants[1]**

The Federal Rules of Civil Procedure provide that, "[i]n the complaint the title of the action shall include the names of all the parties." Fed. R. Civ. P. 10(a); see Myles v. United States, 416

---

[1] Because Plaintiff has not properly named many of the individuals referenced in the Complaint, their alleged actions are not separately addressed in this screening analysis.

F.3d 551 (7th Cir. 2005) ("to make someone a party the plaintiff must specify him in the caption and arrange for service of process."). Although *pro se* litigants are entitled to have their pleadings liberally construed, Haines, 404 U.S. at 520, "[d]istrict judges have no obligation to act as counsel or paralegal to *pro se* litigants," Pliler v. Ford, 542 U.S. 225 (2004).

The body of the Complaint Contains mentions a number of individuals who are not named as defendants in the caption as required by Rule 10(a). This failure renders any allegations against them nullities. See, e.g., Londeree v. Crutchfield Corp., 68 F.Supp.2d 718 (W.D. Va. Sept. 29, 1999) (granting motion to dismiss for individuals who were not named as defendants in the compliant but who were served).

Plaintiff is granted leave to file an Amended Complaint within 14 days of this Order by properly naming any individuals against whom he intends to proceed in the caption in compliance with Rule 10(a).[2] Plaintiff is cautioned that the Amended Complaint must comply with all applicable rules and procedures, and will supersede the Complaint. The statement of the claim should clearly and concisely explain how each individual, while acting under the color of the law, violated his rights. See Fed. R. Civ. P. 8(a).

**(2)** **Supervisory Liability**

A state official can be in a § 1983 suit in three ways: in his personal capacity, his official capacity, or in a more limited way, his supervisory capacity. King v. Rubenstein, 825 F.3d 206, 223–24 (4th Cir. 2016). For personal liability, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." Kentucky v. Graham, 473 U.S. 159, 166 (1985). In an official-capacity suit, however, "[m]ore is required:" the suit is "treated as a suit

---

[2] The Court expresses no opinion about the timeliness, procedural viability, or merit of any such Amended Complaint.

against the entity," which must then be a "'moving force' behind the deprivation," id. (quoting Polk County v. Dodson, 454 U.S. 312, 326 (1981)); thus, the entity's "'policy or custom' must have played a part in the violation of federal law," id. (quoting Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978)). Meanwhile, a supervisor can be liable where (1) he knew that his subordinate "was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury;" (2) his response showed "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) that there was an "affirmative causal link" between his inaction and the constitutional injury." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted).

First, Plaintiff does not allege that Assistant Superintendent Dye was directly involved in the incidents at issue and that, acting under color of state law, he personally deprived Plaintiff of a federal right. Therefore Plaintiff has failed to state a basis for personal liability against Assistant Superintendent Dye. See, e.g., Armstrong v. City of Greensboro, 190 F.Supp.3d 450, 466 (M.D.N.C. 2016) (plaintiff failed to state an individual capacity claim against former police chief because "[m]ere allegations about the environment or generalized encouragement do not rise to the level of alleging a direct connection between [former police chief] and the constitutional violations."). Plaintiff does make some allegations of personal involvement by Unit Manager Parker and Superintendent White which will be addressed individually in the sections that follow.

Second, Plaintiff has failed to state that the alleged constitutional deprivations occurred as a result of a policy or custom by Defendants White, Dye, or Parker. His vague and conclusory claims that these individuals are generally responsible for their employees' actions, that the Defendants were "notified" of "the situation" at some point and failed to act, and that they generally turned a "blind eye" to staff negligence, do not sufficiently allege the existence of a

9

policy or custom that violated federal law. See generally Simpson v. Welch, 900 F.2d 33, 35 (4th Cir. 1990). (conclusory allegations, unsupported by specific allegations of material fact are not sufficient); Dickson v. Microsoft Corp., 309 F.3d 193, 201-02 (4th Cir. 2002) (a pleader must allege facts, directly or indirectly, that support each element of the claim). Therefore, Plaintiff has failed to state a basis for liability in these Defendants' official capacities. See, e.g., Slakan v. Porter, 737 F.2d 368, 373 (4th Cir. 1984) ("Ordinarily, [a plaintiff] cannot satisfy his burden of proof by pointing to a single incident or isolated incidents."); Simmons v. Corizon Health, Inc., 136 F.Supp.3d 719, 722 (M.D.N.C. 2015) (plaintiffs failed to state an official capacity claim against sheriff because a "single, isolated incident is not sufficient to establish a policy or custom….").

Third, Plaintiff's vague and conclusory allegations are insufficient to state a claim for supervisory liability. He does not allege that Defendants White, Dye, and Parker engaged in conduct that posed a pervasive and unreasonable risk of injury, that their response to this risk was deliberately indifferent, or that there was a causal link between the inaction and Plaintiff's injury. His vague and conclusory allegations are insufficient to state a claim. Moreover, the allegation that he wrote to Superintendent White and Assistant Superintendent Dye after Officer White grabbed his backside on a single occasion during a pat-down, and that they failed to remove Officer White from the unit, is not sufficiently widespread or serious to allege a claim of supervisory liability. See, e.g., Bradshaw v. Harden, 401 Fed. Appx. 805, 806 (4th Cir. 2010) (affirming dismissal of Eighth Amendment claim against correctional center's supervisory officials where prisoner failed to allege any facts that would have put defendants on notice that the prison policy was being violated and therefore he could not show that the supervisors were deliberately indifferent to, or had tacitly authorized the conduct of, their subordinates); see also Gandy v. Robey, 520 Fed. Appx. 134, 143 (4th Cir. 2013) (affirming summary judgment where no triable issue existed with regards

10

to a sergeant's supervisory liability because plaintiff failed to identify what evidence, if any, she proffered to show that the sergeant's subordinates were engaged in widespread unconstitutional conduct by using lethal force under circumstances where the suspect posed no threat or that he was aware but deliberately indifferent to that conduct).

The supervisory and official capacity claims against Superintendent White, Assistant Superintendent Dye, and Unit Manager Parker, and any individual capacity claims against Dye, are therefore insufficient to proceed at this time.

**(3)** **Prison Conditions**

The Eighth Amendment prohibits punishments that "involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)). "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir.1996). The Constitution "does not mandate comfortable prisons, … but neither does it permit inhumane ones." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Rhodes v. Chapman, 452 U.S. 337, 349 (1981)). Thus, prison official must provide sentenced prisoners with adequate food, clothing, shelter, and medical care, and "take reasonable measures to guarantee the[ir] safety…." Hudson v. Palmer, 468 U.S. 517, 526-27 (1984); see Farmer, 511 U.S. at 832-34. Inmates' claims that prison officials disregarded specific known risks to their health or safety are analyzed under the deliberate indifference standard of the Eighth Amendment. See Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir.1987).

To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's

health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297-99 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission ... result[s] in the denial of the minimal civilized measure of life's necessities.'" Id. at 298 (citing Rhodes, 452 U.S. at 347).

Plaintiff alleges that Defendant Parker failed to act after Plaintiff notified her that he had soiled himself and did not allow him to shower until the following day. These allegations amount to discomfort and are insufficiently serious to state an Eighth Amendment violation. "While [plaintiff] may have preferred a shower, we cannot say that he was deprived of the minimal civilized measures of human necessities in such a palpable way that injury should be inferred." Shakka v. Smith, 71 F.3d 162, 168 (4th Cir. 1995) (affirming summary judgment for prison officials because their refusal to let plaintiff take a shower for three days after other inmates threw excrement and urine on him was not cruel and unusual punishment; he was provided with water and cleaning materials immediately after informing prison officials of the assault, he presented no evidence that being denied a shower for three days posed a significant risk of future harm); see Curbelo v. Pendergraph, 2006 WL 2240450 (W.D.N.C. June 15, 2006) (dismissing pretrial detainee's Eighth Amendment claim that he had an overflowing toilet and was denied the of use of a toilet for a day, which stated only discomfort).

Plaintiff's claim against Parker for unsanitary conditions of confinement is, therefore, dismissed as insufficient at this time.

**(4) Medical Deliberate Indifference**

As the Supreme Court has explained, "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (citation and internal quotation marks

omitted); see Hill v. Crum, 727 F.3d 312, 317 (4th Cir. 2013) ("the Eighth Amendment's prohibition against 'cruel and unusual punishments' [extends] to the treatment of prisoners by prison officials," and "forbids the unnecessary and wanton infliction of pain.") (internal quotation marks omitted).

The deliberate indifference standard has two components. The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry. See Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008); see Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) ("to establish a claim of deliberate indifference to medical need, the need must be both apparent and serious, and the denial of attention must be both deliberate and without legitimate penological objective."). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko, 535 F.3d at 241 (internal quotation marks omitted). To be found liable under the Eighth Amendment, a prison official must know of and consciously or intentionally disregard "an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837; Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998). A mere delay or interference with treatment can be sufficient to constitute a violation of the Eighth Amendment. Smith v. Smith, 589 F.3d 736, 739 (4th Cir. 2009). However, allegations that might be sufficient to support negligence and medical malpractice claims do not, without more, rise to the level of a cognizable § 1983 claim. Estelle, 429 U.S. at 106; Grayson, 195 F.3d at 695 ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."); see Stokes v. Hurdle, 393 F. Supp. 757, 762 (D. Md. 1975), *aff'd*, 535 F.2d 1250 (4th Cir. 1976) ("even if a prison doctor is mistaken or negligent in his diagnosis or treatment, no constitutional issue is raised absent evidence of abuse, intentional mistreatment, or denial of

13

medical attention.").

Plaintiff appears to allege that Defendant Parker was deliberately indifferent for failing to immediately summon medical help when Plaintiff told her that he was dizzy after falling in the shower. She did summon a doctor the following day, who diagnosed Plaintiff with a sprained back. Plaintiff has failed to adequately explain why his report of dizziness was so serious that Parker, a non-medical staff member, should have known it warranted immediate medical attention,[3] and that she purposefully chose to withhold needed medical care. The allegations are insufficient to show that Defendant Parker's one-day delay in treatment was deliberately indifferent to a serious medical need. See, e.g., Barnett v. Luttrell, 414 Fed. Appx. 784 (6th Cir. 2011) (affirming dismissal of corrections officer where the facts did not show any reason to believe she understood the significance of plaintiff's ingestion of the wrong medication, including any immediate side effects such as dizziness which caused him to fall, and her actions constituted, at most, negligence which is not actionable under the Eighth Amendment); Petersen v. Midgett, 140 F.Supp.3d 490 (E.D.N.C. 2015) (granting summary judgment for defendants where plaintiff, an intoxicated inmate who fell and suffered a head injury, failed to show that his medical needs were apparent and serious; he had no visible external injuries, was conscious, and was able to sign his name).

Therefore, Plaintiff's claim of deliberate indifference against Defendant Parker is dismissed as facially insufficient.

**(5)** **Deprivation of Property**

The Fourteenth Amendment's Due Process Clause provides that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const. Amend XIV. Where

---

[3] According to Plaintiff, the only condition that the doctor diagnosed the following day was a sprained back.

a state employee's random, unauthorized act deprives an individual of property, either negligently or intentionally, the individual is relegated to his state post-deprivation process, so long as the State provides an adequate post-deprivation remedy. Hudson v. Palmer, 468 U.S. 517 (1984); Parratt v. Taylor, 451 U.S. 527 (1981), *overruled on other grounds by* Daniels v. Williams, 474 U.S. 327 (1986)). However, post-deprivation remedies do not satisfy the due process requirement where the deprivation complained of is effected pursuant to an established state procedure rather than a random, unauthorized action. Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982).

Under North Carolina law, an action for conversion will lie against a public official who wrongfully deprives an owner of his property by an unauthorized act. Gallimore v. Sink, 27 N.C.App. 65, 67, 218 S.E.2d 181, 182 (1975). North Carolina's post-deprivation remedies are adequate. N.C. Gen. Stat. § 143-291; see Wilkins v. Whitaker, 714 F.2d 4, 6 (4th Cir. 1983) (due process satisfied where North Carolina tort law provides an adequate avenue for relief for state prisoner).

Plaintiff appears to allege that Defendant Parker was present when some property was seized without completion of the appropriate form and, as a result, some property was lost. Plaintiff's alleged loss appears to have resulted from a random, unauthorized action rather than an established state procedure. Adequate post-deprivation remedies exist for Plaintiff's alleged property loss, so there is no legal theory which would support this claim. See, e.g., Smith v. Ledford, 2006 WL 1431666 at *2 (W.D.N.C. May 22, 2006), *aff'd,* 203 Fed. Appx. 484 (4th Cir. 2006) (dismissing plaintiff's claim that jail administrator confiscated his personal property upon his departure from the jail and refused to return it, because plaintiff had an adequate post-deprivation remedy for conversion).

Therefore, Plaintiff's claim for the loss of his personal property against Defendant Parker

is dismissed.

**(6)** <u>**Negligence**</u>

As a general matter, federal courts have jurisdiction over state law claims "that are so related to claims in [an] action within [their] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367. However, courts may decline to exercise supplemental jurisdiction when: (1) the state law claim raises a novel or complex issue of state law; (2) the state law claim substantially predominates over the claim(s) over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exception circumstances, there are other compelling reasons to decline jurisdiction. <u>Id.</u>

It appears that Plaintiff attempts to assert a North Carolina negligence claim. However, as none of Plaintiff's federal claims have survived initial review, the Court declines to exercise supplemental jurisdiction over the North Carolina tort claim. <u>See</u> <u>generally</u> <u>Gunsay v. Mozayeni</u>, 695 Fed. Appx. 696 (4th Cir. 2017) (affirming the dismissal without prejudice of plaintiff's state law claims because the district court properly dismissed all plaintiff's federal claims and the state-law claims were complex or novel).

Therefore, to the extent Plaintiff attempts to allege a North Carolina negligence claim, it is dismissed without prejudice.

**IV. CONCLUSION**

For the reasons stated herein, the Court finds that the Complaint fails to state a claim upon which relief can be granted at this time and dismisses it without prejudice. Plaintiff may file an Amended Complaint within 14 days of the issuance of this Order, subject to all applicable rules and procedures. Failure to timely comply will result in this case's closure without further notice.

**IT IS, THEREFORE, ORDERED that:**

1. The Complaint is dismissed for failure to state a claim upon which relief can be granted pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

2. Plaintiff is granted leave to file an Amended Complaint within 14 days of this Order.

3. The Clerk is directed to mail Plaintiff a new Section 1983 complaint form.

Signed: November 6, 2017

Frank D. Whitney
Chief United States District Judge